# United States Court of Appeals
# for the District of Columbia Circuit

## No. 25-5455

CAPE COD CHARTER BOAT ASSOCIATION; CONNECTICUT CHARTER & PARTY BOAT ASSOCIATION; DELMARVA FISHERIES ASSOCIATION, INC.; MARYLAND CHARTER BOAT ASSOCIATION, INC.; MONTAUK BOATMEN & CAPTAINS ASSOCIATION,

*Plaintiffs-Appellants,*

*v.*

DOUGLAS BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior; DEPARTMENT OF INTERIOR; PAUL SOUZA, in his official capacity as Acting Director of the U.S. Fish and Wildlife Service; UNITED STATES FISH AND WILDLIFE SERVICE; HOWARD W. LUTNICK, in his official capacity as Secretary of the U.S. Department of Commerce; UNITED STATES DEPARTMENT OF COMMERCE; LAURA GRIMM, in her official capacity as Administrator of the National Oceanic & Atmospheric Administration; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; ATLANTIC STATES MARINE FISHERIES COMMISSION;

*(For Continuation of Caption See Inside Cover)*

*On Appeal from the United States District Court for the District of Columbia in No. 1:25-cv-01457-TNM, Trevor Neil McFadden, U.S. District Judge.*

## PROOF BRIEF FOR PLAINTIFFS-APPELLANTS

ANDREW CHARLES MEEHAN
MACLEOD LAW GROUP, LLC
110 North Cross Street
Chestertown, Maryland 21620
(410) 810-1381
ameehan@mlg-lawyers.com

JAMES J. BUTERA
MEEKS BUTERA & ISRAEL
2020 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 285-3382
jbutera@meeksbi.com

*Counsel for Plaintiffs-Appellants*

April 27, 2026

CP COUNSEL PRESS (800) 4-APPEAL • (392287)

KATIE DYKES, in her official capacity as Commissioner of the Connecticut Department of Energy and Environmental Protection; CONNECTICUT DEPARTMENT OF ENERGY AND ENVIRONMENTAL PROTECTION; WALTER RABON, in his official capacity as Commissioner of the Georgia Department of Natural Resources; GEORGIA DEPARTMENT OF NATURAL RESOURCES; CARL WILSON, in his official capacity as Commissioner of the Maine Department of Marine Resources; MAINE DEPARTMENT OF MARINE RESOURCES; JOSHUA KURTZ, in his official capacity as Secretary of the Maryland Department of Natural Resources; MARYLAND DEPARTMENT OF NATURAL RESOURCES; SHAWN M. LATOURETTE, in his official capacity as Commissioner of the New Jersey Department of Environmental Protection; NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; AMANDA LEFTON, in her official capacity as Acting Commissioner of the New York Department of Environmental Conservation; NEW YORK DEPARTMENT OF ENVIRONMENTAL CONSERVATION; TERRENCE GRAY, in his official capacity as Director of the Rhode Island Department of Environmental Management; RHODE ISLAND DEPARTMENT OF ENVIRONMENTAL MANAGEMENT; THOMAS MULLIKIN, in his official capacity as Director of the South Carolina Department of Natural Resources; SOUTH CAROLINA DEPARTMENT OF NATURAL RESOURCES; RICHARD JACKSON, in his official capacity as Director of District of Columbia Department of Energy and Environment; DISTRICT OF COLUMBIA DEPARTMENT OF ENERGY AND ENVIRONMENT; POTOMAC RIVER FISHERIES COMMISSION; CHERI PATTERSON, in her official capacity as Administrator of New Hampshire Fish and Game Department - Marine Fisheries; NEW HAMPSHIRE FISH AND GAME DEPARTMENT - MARINE FISHERIES; DAN MCKIERNAN, in his official capacity as Administrator of Massachusetts Division of Marine Fisheries; MASSACHUSETTS DIVISION OF MARINE FISHERIES; TIMOTHY D. SCHAEFFER, PH.D., in his official capacity as Administrator of Pennsylvania Fish & Boat Commission; PENNSYLVANIA FISH AND BOAT COMMISSION; JOHN CLARK, in his official capacity as Administrator of Delaware Division of Fish and Wildlife; DELAWARE DIVISION OF FISH AND WILDLIFE; JAMIE GREEN, in his official capacity as Commissioner of Virginia Marine Resources Commission; VIRGINIA MARINE RESOURCES COMMISSION; D. REID WILSON, in his official capacity as Secretary of the North Carolina Department of Environmental Quality d/b/a North Carolina Division of Marine Fisheries; NORTH CAROLINA DEPARTMENT OF ENVIRONMENTAL QUALITY, d/b/a North Carolina Division of Marine Fisheries; JESSICA MCCAWLEY, in her official capacity as Director of the Division of Marine Fisheries Management for the Florida Fish and Wildlife Conservation Commission; DIVISION OF MARINE FISHERIES MANAGEMENT FOR THE FLORIDA FISH AND WILDLIFE CONSERVATION COMMISSION,

*Defendants-Appellees.*

<u>**CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1)**</u>

**A. <u>Parties</u>**

The Cape Cod Charter Boat Association ("CCCBA"), Connecticut Charter & Party Boat Association ("CC&PBA"), Delmarva Fisheries Association, Inc. ("DFA"), Maryland Charter Boat Association ("MCBA"), and Montauk Boatmen & Captains Association ("MB&CA") (collectively, the "Boat Captains") certify themselves as the Plaintiffs-Appellants in this case and further as to other parties, rulings, and related proceedings pursuant to D.C. Circuit Rule 28(a)(1):

Defendants-Appellees are Douglas Burgum, in his official capacity as Secretary of the U.S. Department of the Interior and the Dept. of the Interior; Paul Sousa, in his official capacity as Acting Director of the U.S. Fish and Wildlife Service ("USFWS") and the USFWS; Howard Lutnick, in his official capacity as Secretary of the U.S. Department of Commerce and the Department of Commerce; Laura Grimm, in her official capacity as Administrator of the National Oceanic & Atmospheric Administration ("NOAA") and NOAA; the Atlantic States Marine Fisheries Commission ("ASMFC"); Katie Dykes, in her official capacity as Commissioner of the Connecticut Department of Energy and Environmental Protection and the CT Dept. of Energy and Environmental Protection; Walter Rabon, in his official capacity as Commissioner of the Georgia Department of Natural

Resources and GA Dept. of Natural Resources; Carl Wilson, in his official capacity as Commissioner of the Maine Department of Marine Resources and the ME Dept. of Marine Resources; Joshua Kurts, in his official capacity as Secretary of the Maryland Department of Natural Resources and the MD Dept. of Natural Resources; Shawn LaTourette, in his official capacity as Commissioner of the New Jersey Department of Environmental Protection and the NJ Dept. of Environmental Protection; Amanda Lefton, in her official capacity as Acting Commissioner of the New York Department of Environmental Conservation and the NY Dept. of Environmental Conservation; Terrence Gray, in his official capacity as Director of the Rhode Island Department of Environmental Management and the RI Dept. of Environmental Management; Thomas Mullikan, in his official capacity as Director of the South Carolina Department of Natural Resources and the SC Dept. of Natural Resources; Richard Jackson, in his official capacity as Director of District of Columbia Department of Energy and Environment and the DC Dept. of Energy and Environment; the Potomac River Fisheries Commission; Cheri Patterson, in her official capacity as Administrator of the New Hampshire Fish and Game Department - Marine Fisheries and the NH Fish and Game Dept. - Marine Fisheries; Dan McKiernan, in his official capacity as Administrator of Massachusetts Division of Marine Fisheries and the MA Division of Marine Fisheries; Timothy Schaeffer, in his official capacity as Administrator of the Pennsylvania Fish & Boat Commission

and the PA Fish & Boat Commission; John Clark, in his official capacity as Administrator of Delaware Division of Fish and Wildlife and the DE Division of Fish and Wildlife; Jamie Greem, in his official capacity as Commissioner of Virginia Marine Resources Commission and the VA Marine Resources Commission; D. Reid Wilson, in his official capacity as Secretary of the North Carolina Department of Environmental Quality (d/b/a North Carolina Division of Marine Fisheries) and the NC Dept. of Environmental Quality; and, Jessica McCawley, in her official capacity as Director of the Division of Marine Fisheries Management for the Florida Fish and Wildlife Conservation Commission and the Division of Marine Fisheries Management for the Florida Fish and Wildlife Conservation Commission;

No other parties have appeared before the District Court or this Court.

### B. Rulings under Review

The ruling under review is the opinion and order signed on November 14, 2025, by the United States District Court for the District of Columbia, Hon. Trevor N. McFadden, denying Appellants' motion for a preliminary injunction and granting the governmental entities' motion for summary judgment. The opinion is available at No. 1:2025cv01457 (D.D.C. 2025).

The underlying regulation being contested was issued on January 24, 2024 by the ASMFC's approval of Addendum II to Amendment 7 to the Interstate Fishery

Management Plan ("FMP") for Atlantic Striped Bass. https://asmfc.org/wp-content/uploads/2025/09/PR02AtlStripedBassAddendumII_Approved.pdf

C. **Related cases**

This case has not previously been before this Court but was, as set forth more fully in  the Statement of the Case, in a prior case solely with the ASMFC as the named Defendant which was heard on April 12, 2024 before the United States District Court for the District of Maryland (*Delmarva Fisheries Association, Inc. et al, v. Atlantic States Marine Fisheries Commission* (No. 24-0688)) and an appeal of the same case name thereof was heard before the United States Court of Appeals for the Fourth Circuit (No. 24-1388) on December 11, 2024.  On two occasions, that case by the same name was the subject of an emergency application for a Writ of Injunction for Interim Relief filed with the Supreme Court which were declined prior to the appellate oral argument (No. 24-1388) and subsequent to the appellate decision (No. 24A859).  There are no "other related cases" within the meaning of D.C. Circuit Local Rule 28(a)(1)(C).

**DISCLOSURE STATEMENT**

Appellants are IRS § 501(c)(6) "not-for-profit" entities without parent companies or public stock in any form.  They are volunteer organizations of local boat captains acting together to ensure that their voices are heard at the state and

federal levels for the purpose preserving their multi-generational small businesses

of "for hire" boat chartering and independent commercial fishing.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1)............................i

    A.    Parties ............................................................................................i

    B.    Rulings under Review ................................................................. iii

    C.    Related cases ...............................................................................iv

DISCLOSURE STATEMENT ...........................................................................iv

TABLE OF AUTHORITIES ........................................................................... vii

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF ISSUES ................................................................................2

STATEMENT OF THE CASE............................................................................4

SUMMARY OF ARGUMENT ..........................................................................9

STANDING .....................................................................................................14

ARGUMENT ...................................................................................................15

    I.    Appellees Execute Federal Regulatory Authority .............15

    II.    Applicability of the Anticommandeering Doctrine ...........22

    III.    Standing is Inherent to a Claim of Unconstitutionally Induced Harm ...........28

    IV.    The Eleventh Amendment Is No Bar to this Action .........37

    V.    No Rational or Scientific Basis for the Regulation............41

    VI.    The Fifth Amendment Takings Clause Is Fully Applicable ...............47

CONCLUSION.................................................................................................53

REQUEST FOR ORAL ARGUMENT .............................................................55

DESIGNATION OF THE PARTS OF THE RECORD REQUESTED TO BE INCLUDED IN THE DEFERRED APPENDIX ...........................................55

CERTIFICATE OF COMPLIANCE................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Am. Pelagic Fishing Co. v. United States,*
49 Fed. Cl. 36 (2001), rev'd on other grounds,
379 F.3d 1363 (Fed. Cir. 2004) ...............................................................51

*Armstrong v. United States,*
364 U.S. 40 (1960)................................................................... 49, 50

*Axon Enter., Inc. v. FTC,*
598 U.S. 175 (2023)................................................... 9, 12, 13, 32

*Bell v. Hood,*
327 U.S. 678 (1946)................................................................29

*Bennett v. Spear,*
520 U.S. 154 ............................................................... 33, 54

*Brown v. Board of Education,*
347 U.S. 483 (1954)................................................................29

*Coalition for Responsible Regulation, Inc. v. EPA,*
684 F.3d 102 (D.C. Cir. 2012)...............................................14

*Connecticut ex rel. Blumenthal v. U.S.,*
369 F.Supp.2d 237 (D. Conn. 2005)......................................28

*Cuyler v. Adams,*
449 U.S. 433 (1981)................................................................37

*Defenders of Wildlife Fed'n v. Gutierrez,*
532 F.3d 913 (D.C. Cir. 2008).................................................36

*Delaware River Joint Toll Bridge Commission v. Oleksiak,*
612 F. Supp. 3d 428 (E.D. Pa. 2020)................................. 38, 39

*Delmarva Fisheries Assn., Inc. v. Atl. States Marine Fisheries Comm'r.,*
127 F. 4th 509 (4th Cir. 2025) ..................................................6

*Delmarva Fisheries Ass'n v. Atl. States Marine Fisheries Comm'n,*
2024 U.S. Dist. LEXIS 72432 ....................................................5

*Ex parte Young,*
209 U.S. 123 (1908)................................................... 38, 54

*FERC v. Mississippi,*
456 U. S. 742 (1982)......................................................................................22

*Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.,*
561 U. S. 477 (2010)......................................................................................54

*Galette v. New Jersey Transit Corporation,*
2026 U.S. LEXIS 1195 *; 146 S. Ct. 854 (Mar. 4, 2026)............................. 38

*Hess v. Port Authority Trans-Hudson Corp.,*
513 U.S. 30 (1994)........................................................................................38

*Horne v. Dep't of Agriculture,*
576 U.S. 351 (2015)......................................................................................48

*International Union of Operating Eng'rs, Local 542 v.*
*Delaware River Joint Toll Bridge Comm'n,*
311 F.3d 272 (3d Cir. 2002) .........................................................................38

*Lebanon Valley Auto Racing v. Cuomo,*
478 F. Supp.3d 389 (N.D.N.Y. 2020).........................................................49

*Lofstad v. Raimondo,*
117 F.4th 493 (2024) ......................................................................... 32, 33, 34

*Loper Bright Enterprises v. Raimondo,*
603 U.S. 369 (2024)............................................................................... 32, 54

*Lucas v. South Carolina Coastal Council,*
505 U.S. 1003 (1992)....................................................................................49

*Lujan v. Defenders of Wildlife Fed'n,*
504 U.S. 505 (1992)......................................................................................36

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992)......................................................................................34

*Maine Lobstermen's Assn v. Nat'l Marine Fisheries Service,*
70 F.4th 582 (D.C. Cir. 2023)............................................................ 33, 34, 54

*Marbury v. Madison,*
5 U.S. 137 (1803).........................................................................................29

*Michigan v. EPA,*
576 U.S. 743 (2015)......................................................................................44

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins.*,
464 U.S. 29 (1983)......................................................................46

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018).....................................................................24

*National Federation of Independent Business v. Sebelius*,
567 U.S. 519 (2012)............................................................. 25, 26

*New York v. Atlan. States Marine Fisheries Comm.*,
609 F.3d 524 (2nd Cir. 2010) ....................................................18

*New York v. United States*,
505 U.S. 144 (1992)...................... 11, 12, 22, 23, 25, 26, 27

*Penn Central Transp. Co. v. New York City*,
438 U. S. 104 (1978)...................................................................48

*Pennsylvania Coal Co. v. Mahon*,
260 U. S. 393 (1922)...................................................................48

*Printz v. United States*,
521 U.S. 898 (1997).....................................................................23

*Seila Law LLC v. Consumer Financial Protection*,
591 U.S. 197 (2020)............................................................ 13, 22, 54

*Sierra Club v. EPA*,
292 F.3d 895 (D.C. Cir. 2002).....................................................14

*Tarrant Regional Water Dist. v. Herrmann*,
569 U.S. 614 (2013)............................................................. 40, 43

*Texas v. New Mexico*,
482 U.S. 124 (1987)...................................................................40

**Statutes & Other Authorities:**

16 U.S.C. § 5102(1) .......................................................................27

16 U.S.C. § 5102(13) ......................................................................2

16 U.S.C. § 5104(a)(1)...................................................................16

16 U.S.C. § 5104(b)(1).......................................................... 16, 27

16 U.S.C. § 5104(c) ............................................................... 16, 17

16 U.S.C. § 5105(a) .......................................................................17

16 U.S.C. § 5105(b) ..................................................................17

16 U.S.C. § 5106 ......................................................................17

16 U.S.C. § 5152(10) ............................................................6, 16

16 U.S.C. § 5153(a) ..............................................................6, 16

16 U.S.C. § 5153(a)(1) ..............................................................16

16 U.S.C. § 5153(a)(2) ..............................................................17

16 U.S.C. § 5153(b) ..................................................................17

16 U.S.C. § 5153(c) ..................................................................17

16 U.S.C. § 5154 ..................................................................5, 17

16 U.S.C. §§ 5151-5158 ..............................................................1

28 U.S.C. § 1291 ........................................................................1

28 U.S.C. § 1294(1) ....................................................................1

42 U.S.C. § 2021c(a)(1)(A) ......................................................22

42 U.S.C. § 2021e(d)(2)(C) ......................................................23

2018 Congressional Research Service Report ........................23

ASMFC 2023 Annual Report ..................................................21

ASMFC Review of the Interstate FMP for Atlantic Stripped Bass
   (Jan. 2024)............................................................................41

Chemerinsky, Erwin. Constitutional Law: Principles and Policies (2019) ............29

Chesapeake Bay Program: Learn the Issues: Agriculture Runoff ..........................53

Hearing before the Committee on Commerce, Science, and Transportation
   on "Developments and Opportunities in U.S. Fisheries Management"
   113th Cong., 2nd Sess. (Mar. 19, 2013) ..............................9

National Wildlife Federation Blog: A Big Dam Problem: Cleaning up
   Conowingo (May 30, 2023)..................................................52

Pub. Law 77-539 ......................................................................17

Pub. Law 81-721 ........................................................................6

Pub. Law 98-613 ........................................................................1

Pub. Law 103-206 ........................................................................................2

Pub. Law 111-148 ......................................................................................25

Steven J. Eagle, *The Four-Factor Penn Central Regulatory Takings Test*,
118 Dick. L. Rev. 601 (2014) ...............................................................51

# GLOSSARY OF ABBREVIATIONS

ACA: Affordable Care Act

ASMFC: Atlantic States Marine Fisheries Commission

FMF: Fishing Management Plan

MSA: Magnuson-Stevens Act

NMFS: National Marine Fisheries Association

NOAA: National Oceanic and Atmospheric Administration

USFWS: United States Fish & Wildlife Service

**JURISDICTIONAL STATEMENT**

Pursuant to 28 U.S.C. §§ 1291 and 1294(1), the Plaintiffs-Appellants Boat Captains appeal from the dismissal of their case and mooting of their Motion for Preliminary Injunction entered on November 8, 2025, by the U.S. District Court for the District of Columbia (Case No. 1:25-cv-1457 (TNM)).

Membership of all Appellant trade associations, consist of commercial fishing businesses to include "for hire" charter boats leased to individuals for the purpose of recreational fishing for Atlantic Striped Bass on an hourly or daily basis. These are almost exclusively owner-operated, small businesses employing a single mate or perhaps two on larger vessels.

The Defendants-Appellees in this constitutional case consist of an Interstate Commission created in 1942 as an advisory Interstate Compact composed of 15 states from Maine to Florida, but in 1984 was converted by Congress into the governmental entity responsible under federal law for the preparation, adoption and implementation of federal FMPs for its participating states with respect to Atlantic Striped Bass.[1] 16 U.S.C. §§ 5151-5158 ("Striped Bass Act").

The states as referenced above, in addition to being named as Co-Defendants in their capacities as the ASMFC's "compacting" states, were also named

_____

[1] Atlantic Striped Bass Conservation Act of 1984 (Pub. Law 98-613).

1

individually and separately as Defendants, to include agency heads acting in their official capacities as the respective heads of their state (or subdivisions thereof) functioning as fishery management agencies.[2]

Also named as Defendants in this constitutional case are the U.S. Departments of Commerce and the Interior which are the two federal agencies charged with the administration of federal fishing management laws under the Magnuson-Stevens Act ("MSA"). During the time period applicable herein, these federal agencies were full participants in ASMFC proceedings and voted (albeit illegally) in favor of the contested fishing regulation while at the same time, providing up to 99 percent of the more than $100 million in federal funding utilized to operate the ASMFC. The Secretaries of these two federal agencies (collectively the "Federal Defendants") were also named as Defendants in their official capacities.

**<u>STATEMENT OF ISSUES</u>**

(1)  Whether the District Court erred in its Opinion concluding that Congress has not designated the ASMFC as the promulgator and thus the cause of the

---

[2] In 1993, the ASMFC's authority was expanded to another 26 nearshore migratory fish species through the enactment of the Atlantic Coastal Fisheries Cooperative Management Act (Pub. Law 103-206) ("Atlantic Coastal Act"), which also "designated" the District of Columbia and the Potomac River Fisheries Commission as ASMFC "states" (16 U.S.C. § 5102(13)) thus purportedly enabling those entities to become full ASMFC participants to include voting affirmatively to adopt the fishing regulation challenged here.

regulation wrongfully constraining the Appellants commercial fishing activities pursuant to its delegation of authority under the Striped Bass Act.

(2) Whether the District Court abused its discretion by failing to address that the fishing limitations promulgated on January 24, 2024 by the ASMFC were unconstitutional by virtue of the very structure of the ASMFC as reconstructed by an Act of the U.S. Congress in 1984 from an advisory Interstate Compact into a federal rule-writing agency in violation of the Tenth Amendment's anti-commandeering doctrine.

(3) Whether the District Court erred when concluding that the Boat Captains lacked sufficient Article III standing to assert Tenth Amendment, Fifth Amendment and other constitutional objections to the actions of the ASMFC and all other Appellees acting in concert with the ASMFC to deprive Appellants of their property and ongoing livelihood without due process of law.

(4) Whether the District Court further abused its discretion by thereby foreclosing any practical opportunity for meaningful interim judicial relief and damage avoidance during the pendency of this judicial proceeding during which time the value of Appellants' businesses and business properties are being destroyed without compensation by action of federal and state government regulation.

## STATEMENT OF THE CASE

Appellants MBCA and DFA initiated a prior lawsuit against the ASMFC on March 7, 2024 in Federal Court in the District of Maryland in response to the ASMFC's January 24, 2024 promulgation of drastic, ungrounded, and illegal limitations on commercial and recreational fishing for Striped Bass along the coastal Atlantic Ocean to include the Chesapeake Bay and other inland waterways. This regulation (hereafter referred to as the "2024 Striped Bass Addendum" or "Addendum II") was adopted by a vote of 14-2 with the state of Maryland voting no.[3]

The 2024 Striped Bass Addendum reduced fishing opportunities for this species by: (1) shortening the fishing season; (2) reducing the size of removable fish; (3) lowering commercial quotas; and, (4) most significantly for purposes of the Maryland aspect of this case, limiting recreational fishers using "for hire" charter

---

[3] In violation of its own Code of Rules, the Commission's 14-2 vote on adopting Addendum II was arrived at by starting with 15 compacting states, disqualifying three states (SC, GA and FL) as not being parties at interest, and then allowing four non-state entities (viz, the District of Columbia, the Potomac River Fisheries Commission, USFWS and NOAA) to vote even though the ASMFC's own rules provide that action can only be taken by "the affirmative vote of a majority of the whole number of **compacting states** which have an interest in such species. (Art. VI). https://www.asmfc.org/files/pub/CompactRulesRegs_Feb2016.pdf (Emphasis added).

vessels to one fish per person as opposed to the two fish limitation applicable to that state over the last ten years.

Notwithstanding its negative vote on the ASMFC's adoption of Addendum II, Maryland and all other ASMFC states, as required by federal law in order to avoid a complete federal prohibition on Striped Bass fishing in their states (16 U.S.C. § 5154), subsequently adopted Addendum II as part of their states' fishing regulations.

In their briefing submissions and oral arguments in the prior case, MCBA specified that their member charter boat businesses incurred an immediate revenue decline as high as 75% or more during the 2024 Striped Bass fishing season versus the prior years' comparable income. Notwithstanding the acknowledgement by the Maryland District Court that "there's more immediate irreparable harm on your clients obviously," that court denied Appellants' Motion for a Preliminary Injunction on April 22, 2024, on Article III standing grounds, namely that "the Commission does not **directly** regulate Plaintiffs." *Delmarva Fisheries Ass'n v. Atl. States Marine Fisheries Comm'n*, 2024 U.S. Dist. LEXIS 72432 * 7 (Emphasis added).

The Boat Captains immediately filed an appeal with the Fourth Circuit on April 29, 2024, but that Circuit denied the appeal and then dismissed the case altogether on the basis of the same illogic applied by the Maryland District Court, namely that:

> Plaintiffs sued the Commission, not Maryland. **But they are regulated by Maryland, not the Commission…** Plaintiffs also argue, without

support, that the Commission "directly regulate[s]" them. Opening Br. at 18. But the Commission **"recommend[s]" regulations** to states. Compact, Art. IV, 56 Stat. 268. **It does not itself promulgate regulations or otherwise bind individuals.**[4]

*Delmarva Fisheries Assn., Inc. v. Atl. States Marine Fisheries Comm'r.,* 127 F. 4th 509, 515 (4th Cir. 2025) (Emphases added).

That sentence could not be more incorrect as the citation relied upon above by the Fourth Circuit that the ASMFC only "recommends regulations" (Compact, Art. IV, 56 Stat. 268) existed in the initial 1942 congressional ratification of the ASMFC,[5] but it is completely inapposite at this time as a consequence of the previously described 1984 <u>federal</u> legislation converting the ASMFC from an advisory Compact into it present function to "**prepare and adopt**" FMPs for Atlantic Striped Bass mission" (codified at 16 U.S.C. § 5152(10)). The 1984 <u>federal</u> legislation further specified that "**Each** [ASMFC] **State … shall implement and enforce** the measures of such plan **within the timeframe established in the plan**." *Id*. at § 5153(a) (Emphases added).

_____

[4] During the prior proceedings, Appellants twice filed an emergency application for Writ of Injunction for Interim Relief with the Supreme Court which were declined during the period prior to oral argument before the Circuit and after the issuance of the Circuit Opinion on February 4, 2025.

[5] The ASMFC charter was amended in 1950 in a manner not herein relevant and was, accordingly, issued a second ratification by the Congress (Pub. Law 81-721).

Thus, at that time the State of Maryland was compelled under <u>federal</u> law to adopt the 2024 Striped Bass Addendum promulgated by the ASMFC as part of its own fishing regulations as were all other ASMFC participating states. In essence, all prior courts chose to ignore the post-1984 coercive (and unconstitutional) federal genesis of the actions by the ASMFC, all of its participating states and, as to be further described herein, its federal "partners" (U.S. Commerce and Interior Departments) which fund almost all of the operations behind what purports to be an Interstate Compact.

In spite of this clear error on the part of both prior courts, the Appellants opted, in lieu of filing a writ of *certiorari,* to take the state participation issue off the table by filing this second and more comprehensive suit on May 13, 2025 also naming Maryland, the other ASMFC participants, and the relevant Federal agencies (hence this venue) as Defendants in order to have all parties in the Addendum II causal chain of events before the court.

By that time, with the 2025 and now the 2026 Striped Bass Fishing season having already commenced and even with the top Maryland fishing official having publicly admitted that the "science may be imperfect" behind Addendum II (*Kent County News* (Mar. 9, 2025)), the ASMFC refused to take any actions to remediate the disastrous impact of the 2024 changes prior to the start of the subsequent Striped Bass fishing seasons along the Atlantic coast. Also, by then, the adverse impact of

the ASMFC Striped Bass fishing restrictions had spread well beyond the Chesapeake Bay into a number of other states with their charter boat associations also joining this case as Co-Plaintiffs (CT, NY, and MA).

Nonetheless, the District Court for the District of Columbia made the same illogical, irrelevant and wholly semantic error in its ruling that:

> neither Addendum II nor any other Commission-produced plan **directly regulates** fishermen. Instead, the Commission identifies minimum conservation measures that signatory States then **operationalize** by implementing and enforcing their own regulations.

*Cape Cod Charter Boat Ass'n, et al. v. Douglas J. Burgum, et al.*, No. 1:25-cv-1457, Memorandum Opinion, p. 15 (D.D.C. Nov. 11, 2025), ECF No. 85 (Emphasis added).

There is no usage of the word "direct," "indirect," or anything in between in the relevant statutory language wherein Congress gave the Commission the authority to the ASMFC to require its members states to implement provisions of every ASMFC approved FMP. Lest there be any question as to the post-1984 compulsory power of the ASMFC, one need to look no further than the organization's own Executive Director, Mr. Robert Beal, who had stated as follows in testimony before the U.S. Congress:

> These two laws provide the Commission with unique management authorities and responsibilities relative to the other two interstate marine fisheries commissions in the Gulf of Mexico and Pacific regions

… Congress recognized a need for action and **gave the Commission** the authority to **require** states to implement provisions of each FMP.[6]

It was plain error on the part of the District Court to rewrite applicable law with qualifying word such as "directly," as was well explained by Justice Gorsuch concurring in *Axon Enter., Inc. v. FTC,* 598 U.S. 175, 217 (2023): "We have no authority to froth plain statutory text with factors of our own design, all with an eye to denying some people the day in court the law promises them."

By means of this continuing rejection of Appellants' Article III standing, even with the State of Maryland and all other ASMFC states (referred to, as noted, by the USFWS as their shared "management partners"), Appellants' irreparable harm remains manifest and ongoing. Hence this appeal of the Appellants' second and current suit.

## SUMMARY OF ARGUMENT

The District Court for the District of Columbia was even more "creative" than its predecessors by characterizing the ASMFC's mandatory regulatory as just an exercise to "operationalize" ASMFC pronouncements. *Cape Cod Charter Boat Ass'n, v. Douglas J. Burgum, supra*, Memorandum Opinion, p. 15. This is another

---

[6] Hearing before the Committee on Commerce, Science, and Transportation on "Developments and Opportunities in U.S. Fisheries Management" 113th Cong., 2nd Sess. (Mar. 19, 2013) (Emphases added).

stark and semantic contradiction of the obvious beginning with the ASMFC's initial publication of Addendum II on January 25, 2024, specifying to its members states that "All Addendum II measures must be <u>implemented</u> by May 1, 2024."[7] (Emphasis added).

Consistent with the just quoted congressional testimony of its Executive Director Mr. Beal, the ASMFC concedes the same point at p. 2 of its Opposition Brief below in stating that the "ASMFC plans merely establish a **"floor** for state efforts; member states are free to adopt "additional conditions." ECF No. 48 (Emphasis added). Here again, inserting the word "merely" into the foregoing sentence does not alter the plain English usage of establishing a regulatory floor pursuant to the underlying <u>federal</u> law and over 40 years of continual practice.

The Combined States' Opposition Brief also forfeits on this point in their filings acknowledging that: "The states **were required** to adopt regulations implementing Addendum II." ECF No. 47, p. 5 (Emphasis added). Similarly, the Opposition Brief of Georgia and South Carolina concedes that "At issue in this case is a 2024 addendum to a 'fisheries management plan' **instituted** by the ASMFC" (ECF No. 36-1, p.1) and further that it "is the ASMFC as a body that has the authority

---

[7] https://asmfc.org/news/press-releases/asmfc-atlantic-striped-bass-board-approves-addendum-ii/

10

to act. Defendants have **no authority to undo or correct  any action taken by the ASMFC** (ECF No. 36-1, p. 13) (Emphases added).

By overriding the Appellees' own language, the District Court has essentially countermanded the stipulations of the appellees themselves on one of the most critical legal elements of the pending case.

To circumvent the fact that Maryland now stands in the position of being a named defendant, the District Court seeks to dismiss the Appellants' Tenth Amendment and other constitutional objections on standing grounds as follows: "Although courts have suggested that the causation and redressability showing can be relaxed for other constitutional defects … But Plaintiffs do not allege that sort of constitutional defect." *Cape Cod Charter Boat Ass'n v. Burgum*, *supra*, Memorandum Opinion, p. 19.

By no means conceding, as the District Court seems to suggest by the foregoing that there may exist some lesser forms of constitutional objection, Appellants have consistently asserted numerous constitutional claims. The overarching one, however, is the Tenth Amendment's anticommandeering doctrine with the seminal case being *New York v. United States,*505 U.S. 144 (1992) where Justice O'Connor's ruling enunciated as follows:

> [t]he Framers explicitly chose a Constitution that confers upon Congress the power **to regulate individuals, not States** (*Id.* at 166), while further observing that "No matter how powerful the federal interest involved, the Constitution simply does not give Congress the

authority to require the States to regulate. The Constitution instead gives Congress the authority to regulate matters directly and to pre-empt contrary state regulation. Where a federal interest is sufficiently strong to cause Congress to legislate, **it must do so directly; it may not conscript state governments as its agents.** (*Id.* at 178) (Emphases added).

The pending action invokes a second constitutional aspect in the form of a Fifth Amendment Regulatory "taking" case wherein, for example, just in the State of Maryland, over 60 companies have already been driven out of business through a staggering 70% governmentally introduced attrition to the annual revenues at their previously successful businesses. The third constitutional flaw stems from replete instances of due process violations with regard to the manner in which the ASMFC and its participating states conduct their unconstitutionally delegated authority.

For all these reasons, Appellants must respectfully object as to the massive understatement by the District Court that the applicable precedents on standing regarding constitutional objections represent nothing more than <u>some</u> "courts have suggested that the causation and redressability showing can be relaxed for other constitutional defects."

A very significant case, fully cited by the Appellants in their Motion for a Preliminary Injunction and in their opposition to the Appellees' Motions to Dismiss (ECF No. 53, pp. 30, 33) shows the Supreme Court standing firmly for the proposition that constitutional deficiency plus harm equals standing as per Justice Kagan's opinion (with no dissent) on remanding *Axon* to the Ninth Circuit:

The harm *Axon* and *Cochran* allege is "being subjected" to "unconstitutional agency authority" — a "proceeding by an unaccountable ALJ." That harm may sound a bit abstract; but this Court has made clear that it is **"a here-and-now injury."** (Internal cites omitted.) *Axon supra at* 191, citing *Seila Law LLC v. Consumer Financial Protection* 591 U.S. 197, 212)(2020) (Emphasis added).[8]

Lastly on these matters by way of preface, Appellants take specific exception to that part of the opinion stating that Appellants "cannot decide whether the result of enjoining Addendum II would be to return power to the states or to return power to the federal government." *Cape Cod Charter Boat Ass'n v. Burgum*, *supra*, p. 17. The purpose of enjoinment is of course to stop the ongoing damage into what is the third year of damage infliction on the Appellants with the 2026 Striped bass fishing season having started on January 1, 2026. As to the proper remedy on the merits, Appellants were quite clear in their Reply Brief that "the most logical remedy in this case, should Plaintiffs prevail, is the return of the unconstitutionally delegated authority to the federal government where it previously existed, namely to the Departments of Commerce and Interior."

_____

[8] In point of fact, the harm in this case is far graver than both in *Axon* and *Seila Law* where the Plaintiffs' disputes centered on having to appear in proceedings called before unconstitutionally appointed administrative forums. In this case, Appellants businesses are being destroyed or, at a minimum, their business income is being severely diminished.

## STANDING

Industry Appellants have associational standing as each association (1) [has] at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

Courts regularly acknowledge standing and ripeness under Article III when association members can demonstrate "substantial probability,"[9] but here the Boat Captains were able to declare even before Addendum II took effect that their scheduled chartered business reservations had collapsed by up to 50 percent (Dec. of MCBA Captain Brian Hardman).  As more fully explained *infra*, at no time and in no related case has this injury-in-fact ever been refuted and, most importantly, never has the constitutionality of the 1984 congressional transformation of an interstate compact into a federal "agent" ever been addressed.

_____

[9] E.g., *Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 130 (D.C. Cir. 2012).

# ARGUMENT

## I.  Appellees Execute Federal Regulatory Authority

The assertion by the prior federal courts and the court below that the individual states such as Maryland, act on their own initiative as the actual source of Striped Bass fishing regulations would certainly have come also a surprise to the 325 individuals who turned out for the hearing held on September 23, 2025 by the ASMFC and the Maryland Department of Natural Resources on the plans for the 2026 fishing season.  That presentation consisted of an ASMFC official outlining the various options for approximately one hour followed by a Maryland official taking but five minutes to add reiterate the same position.

Likewise, the courts' passive characterization of the ASMFCs role in this regulatory scheme would be news to its own members such as New Jersey which states on its fishery and wildlife website that federal law:

> **mandates** that states implement and enforce management measures to support approved ASMFC Fishery Management Plans. States failing to comply with the ASMFC plan are subject to a federally imposed moratorium on fishing for the species involved within the waters of the noncomplying state.[10] (Emphasis added).

_____

[10] https://dep.nj.gov/njfw/councils-and-committees/atlantic-states-marine-fisheries-commission/.

Also on the list of surprised parties would be the federal government since, as noted, these very unambiguous words appear on the USFWS website:

> The three partners which **share management responsibility** for Atlantic Striped Bass are the Atlantic States Marine Fisheries Commission, the National Marine Fisheries Service and the U.S. Fish & Wildlife Service.[11] (Emphasis added).

It is no coincidence that the word "mandatory" has been invoked by both Mr. Beal and the State of New Jersy in describing the ASMFC's authority over its participating members states as it is the only conclusion which can reasonably be drawn from this extensive list of functions which were delegated by the U.S. Congress to the ASMFC and which must be carried out as a regulatory <u>floor</u> with respect to its participating member states regarding Striped Bass <u>and</u> 26 other migratory species in coastal and inland waterways:

1. "The Commission shall **prepare and adopt** coastal fishery management plans to provide for the conservation of coastal fishery resources" (16 U.S.C. §§ 5104(a)(1) and 5152(10));

2. "**Each State … shall implement** and enforce the measures of such plan within the timeframe established" (16 U.S.C. §§ 5104(b)(1) and 5153(a));

3. "The Commission shall, at least annually, **review each State's implementation**" (16 U.S.C. §§ 5104(c) and 5153(a)(1));

_____

[11] https://www.fws.gov/law/atlantic-striped-bass-conservation-act#:~:text=The%20three%20partners%20which%20share,U.S.%20Fish%20and%20 20Wildlife%20Service.

4. "The Commission shall, at least annually, review **each State's … enforcement**" (16 U.S.C. §§ 5104(c) and 5153(a)(2));

5. "The Commission shall determine that a State is **not in compliance**" (16 U.S.C. §§ 5105(a) and 5153(b); and,

6. "Upon making any [negative] determination under subsection (a), the Commission shall within 10 working days **notify the Secretaries** of such determination. (16 U.S.C. §§ 5105(b) and 5153(c). (Emphases added.)

7. The Interior Department's acts as the "primary research agency of the ASMFC." (Pub. Law 77-539 (May 4, 1942): Article VII) and,

8. NOAA is the funding source for virtually all of the ASMFC's ongoing operations. https://asmfc.org/category/resources/annual-report/

Thus, there can be no equivocation in light of the foregoing that the ASMFC's promulgations such as the 2024 Striped Bass Rule have the full effect of federal law and must be followed by all the ASMFC's participating states at the risk of having the federal government prohibit fishing for a given species in that state. Other penalties under federal enforcement authority when called in by the ASMFC can include civil and criminal penalties and forfeitures in the Coast Guard. U.S.C. (§§ 5106 and 5154).

The ASMFC is not entitled to have it both ways by telling the U.S. Congress that its post-1984 authority over its members states is "mandatory" and then coming before the federal courts with the obvious hedge by way of inserting the qualifying word "directly" in front of its denial it regulates "fishing activity" as it did in its Opposition brief and throughout the entire process of this litigation.

17

The court below makes precisely the same error in that part of its Opinion stating that "Maryland has not only implemented Addendum II's requirements; it has gone beyond the **regulatory floor** Addendum II sets." *Cape Cod Charter Boat Ass'n v. Burgum*, *supra*, Memorandum Opinion, p. 5. How can the District Court concede that there is a <u>regulatory floor</u> for Maryland and other states to act upon while at the same time concluding that the ASMFC does not regulate fishing?[12]

Also in this context, it is instructive to review how the 1984-1993 congressional transformation of the Commission's role from advisory into mandatory with these examples from independent parties to include scholars, fishing industry experts and state regulatory authorities including several from states now claiming the opposite in order to keep accessing millions of dollars in federal funding. For example, a 2005 article published in the Roger Williams University Law Review added the word "obligated" to the above-referenced compulsory lexicon:

> Between 1950 and 1984, the ASMFC served only an advisory role in fisheries regulation development to its member states. In 1984, … Congress passed the Atlantic Striped Bass Conservation Act, **giving the ASMFC regulatory authority** only over the coastal management of striped bass… member states are **obligated** to implement the

---

[12] The court below also appears to be confused in this regard as its opinion invokes *New York v. Atlan. States Marine Fisheries Comm.,* 609 F.3d 524 (2nd Cir. 2010) numerous times even though that decision states unequivocally that "Each state is **obligated** to carry out the terms of the ASMFC Compact." (Emphasis added).

regulations contained in the FMPs developed by the ASMFC. Vol. 11: Iss. 1, Article 5 (p. 239) (Emphases added).

The retired director of the Massachusetts Division of Marine Fisheries commented as follows in an article appearing in the *Cape Cod Times*:

> The Atlantic Striped Bass Conservation Act … gave the Atlantic States Marine Fisheries Commission the authority to **require** the states to develop and implement an accountable restoration plan that would assure adherence to its **stringent** provisions. Very simply, if a state had migratory striped bass, **it either implemented the plan and participated in the management program or it couldn't fish**. (Oct. 4, 2017) (Emphases added).

Charles Witek, another industry expert who has served on a number of state, regional, and federal fishery management bodies, stated it succinctly in this manner: "Congress passed the Atlantic Striped Bass Conservation Act in 1984 to **compel** every state to adopt it; those that refused would have their striped bass fisheries completely shut down. *Marine Fish Conservation Network* (Nov. 28, 2023) (Emphasis added).

Perhaps most significantly, an Opinion Letter by Office of the North Carolina Attorney General characterized this seismic shift at the ASMFC as follows:

> QUESTION: Did the Atlantic Coastal Fisheries Cooperative Management Act alter the purposes of the ASMFC as established in the interstate compact approved by the Congress?

> ANSWER:   YES. The original purpose of establishing a means for the voluntary and cooperative regulation of fisheries by the member states was changed by Congress when it enacted the Atlantic Coastal Act. **That Act empowered the ASMFC to make binding decisions, enforceable against the states** through sanctions levied by the United

States Secretary of Commerce, even when there has been no determination by the states to join in a particular regulatory program. (Constitutionality of the Atlantic Coastal Fisheries Cooperative Act (Mar. 26, 1996)). (Emphasis added.)

Quoting further from the advisory opinion which heretofore had been the official position of one of one of the state appellees in this case:[13]

The Atlantic Coastal Act enacted by Congress in 1993 expanded the ASMFC's power **to make its decisions binding on the states, as defined in the Act, without the consent of the states.** The ASMFC has become the agency charged by the Congress with establishing and implementing fisheries management for migratory fish stocks in waters along the Atlantic seaboard that were historically state controlled. In the discharge of that power and duty, **the ASMFC is exercising the sovereignty of the United States**, rather than the collective power of the subscribing states.

For present purposes, it is essential to appreciate that the seismic functional shift at the ASMFC from advisory to mandatory vis-à-vis its member states was not a state function but a federal override thus invoking the Tenth Amendment aspect which, on Appellants' best information and belief, no federal court has yet to opine.

In short, no amount of wordsmithing can obviate that by Acts of Congress in 1984 and in 1993, the ASMFC ceased being "advisory" in nature and has instead been in the business of preparing and enforcing an ever-expanding scope of federal mandates onto its member states and has been doing so while being overwhelmingly

---

[13] Also see, *infra,* the Connecticut Attorney General taking the same 10th Amendment position as the Appellants rather than the opposite view now being advanced by the State of Connecticut.

funded by the government. In fact, during the year when Addendum II was initiated, the Federal Defendants funded 99 percent of the ASMFC's $97 million operating budget. (ASMFC 2023 Annual Report (pp. 14-16)).

In the face of this practical, indeed universal "real world" understanding that ASMFC is the actual regulator of fishing in the Atlantic coastal and inland waters of the United States. In light of the unequivocal 1984 and 1993 federal statutory language designating the ASMFC to "prepare, adopt and implement" mandatory FMPs; in light of the Congressional testimony of ASMFC's own Executive Director; and in light of 40 years at the apex of this massive federal/state overregulation of the domestic fishing industry, it borders on the preposterous for the Appellees to continue insist that the 2024 Striped Bass Addendum does not "regulate" fishing.

By the same token, there exists no valid basis for the Court below to conclude that "Because Maryland enacts the restrictions through its own regulatory process, the laws would persist without Addendum II." *Cape Cod Charter Boat Ass'n v. Burgum*, *supra*, Memorandum Opinion, p. 15. Those were not the chronology of the facts in this case and the Supreme Court has held that "a litigant challenging governmental action as void on the basis of the separation of powers is not required to prove that the Government's course of conduct would have been different in a

'counterfactual world' in which the Government had acted with constitutional authority." *Seila Law, supra* at 212.[14]

## II. Applicability of the Anticommandeering Doctrine

The text of the Tenth Amendment reads that: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States." As noted, the primary legal standard stemming from to the Tenth Amendment was is the anticommandeering doctrine which first began to emerge in *FERC* v. *Mississippi*, 456 U. S. 742 (1982): "This Court never sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations." (761-62). It was ten years later, upon the issuance of *New York v. U.S. supra,* when the anticommandeering doctrine came into full measure.

In that case, which significantly, also involved an interstate compact, the Court struck down a federal law requiring for each state "either by itself or in cooperation with other States" to provide for the disposal of . . . low-level radioactive waste generated within the State. 42 U. S. C. § 2021c(a)(1)(A). Alternatively, the federal law specified that the state had to "take title" and "possession" itself to any the low level radioactive generated within its borders and regulate its citizens in accordance with a number of congressionally provided options. *Id.*,

_____

[14] See also Oral Argument discussion of this same point at 22-23.

§ 2021e(d)(2)(C).   The critical point, however, as explained by Justice O'Connor, is: that "A State may not decline to administer the federal program. No matter which path the State chooses, it must follow the direction of Congress." *New York* at 177.

As summarized in this 2018 Congressional Research Service Report:

The Court explained in *New York* that although the Constitution grants Congress broad power "to pass laws requiring or prohibiting certain acts" by private actors, the federal government may not "directly . . . compel the States to require or prohibit those acts." Because the federal law at issue in New York **required** states to either take title to radioactive waste or adopt certain laws, the Court concluded that the federal law unconstitutionally "commandeered" the authority of state governments.      https://www.congress.gov/crs-product/LSB10133 (Emphasis added).

Inasmuch as it has already been thoroughly demonstrated that the Congress did the same thing (also via an interstate compact) by designating the ASMFC as the instrument to require its compacting states to "implement" FMPs "prepared and adopted" for Striped Bass, there can be no escape for the ASMFC from the Tenth Amendment's anti-commandeering doctrine.

Five years after deciding *New York*, the Supreme Court said this in *Printz v. United States* 521 U.S. 898, 935 (1997) striking down a federal law requiring states to perform background checks with respect to handgun licenses:

The Federal Government may neither issue directives requiring the States to address particular problems, **nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.** It matters not whether policymaking is involved, and no case-by case weighing of the burdens or benefits is necessary; such commands are fundamentally

23

incompatible with our constitutional system of dual sovereignty." (Emphasis added; Justice Scalia writing for the Majority).

In *Murphy v. Nat'l Collegiate Athletic Ass'n,* 584 U.S. 453 (2018), the Supreme Court enunciated this governing principle even more emphatically:

> The Constitution confers on Congress not plenary legislative power but only certain enumerated powers. Therefore, all other legislative power is reserved for the States, as the Tenth Amendment confirms. **And conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States**… it is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision **to withhold from Congress the power to issue orders directly to the State**s. (At 469-470 (Emphases added; Justice Alito writing for the Majority).

The Appellants uniformly stress the point that the 1984 and 1993 Acts were just intended to "improve state and federal cooperation" as the does the court in observing that the Striped Bass Act and the Atlantic Coastal Act "strengthen federal-State cooperation." *Cape Cod Charter Boat Ass'n v. Burgum, supra*, at fn. 1. While those concepts may be worthy in the proper context, they cannot be surrendered to the Tenth Amendment and are the reverse of the constitutional design outlined by James Madison in Federalist No. 51:

> In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people.

Lastly, and as is often overlooked, the anticommandeering doctrine was also at the center Chief Justice Roberts' majority opinion in the case seeking to overturn

the Affordable Care Act ("ACA") (Public Law 111-148 (March 23, 2010)). In *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 538 (2012), Chief Justice Roberts said: "Our respect for Congress's policy judgments thus can never extend so far as to disavow restraints on federal power that the Constitution carefully constructed," and it was on this precise basis, the opinion said:

> [Plaintiffs] "object that Congress has "crossed the line distinguishing encouragement from coercion," *New York*, *supra*, at 175, in the way it has structured the funding: Instead of simply refusing to grant the new funds to States that will not accept the new conditions, Congress has also threatened to withhold those States' existing Medicaid funds. The States claim that this threat serves no purpose other than to force unwilling States to sign up for the dramatic expansion in health care coverage effected by the Act. Given the nature of the threat and the programs at issue here, **we must agree**. *National Federation of Independent Business v. Sebelius*, 567 U.S. at 580.

Then in language remarkably similar to the applicable law in this case where the Secretary of Commerce retains residual power to impose a complete moratorium on fishing within the waters of a non-complying state, the Chief Justice observes:

> Nothing in our opinion precludes Congress from offering funds under the Affordable Care Act to expand the availability of health care, and requiring that States accepting such funds comply with the conditions on their use. **What Congress is not free to do is to penalize States that choose not to participate** in that new program by taking away their existing Medicaid funding. **Section 1396c gives the Secretary of Health and Human Services the authority to do just that.** It allows her to withhold *all* "further [Medicaid] payments . . . to the State" **if she**

**determines that the State is out of compliance** *Id.* at 585. (Emphases added).[15]

The ASMFC attempts to argue around this by pointing out that no State has ever left the Compact which and then claims this "is not a sign of 'coercion,' but satisfaction." (ECF No. 48, p. 36). But it matters not whether the states, acting individually or in the form of an Interstate Compact, may choose to conform as it is also specified in *New York, supra* that "Where Congress exceeds its authority relative to the States, therefore, the departure from the constitutional plan cannot be ratified by the "consent" of state officials." *New York v. United States*, 505 U.S. at 182.

The court below also makes a flawed attempt to dodge the Tenth Amendment by seeking to distinguish between state waters and federal waters *Cape Cod Charter Boat Ass'n v. Burgum, supra*, Memorandum Opinion, p. 17. The Tenth Amendment allows for no such distinction as the gravamen of anticommandeering doctrine is the coercion factor regardless of federal or state commerce is directed. The District Court is also incorrect in its assumption that the federal government does not also

_____

[15] While the ACA case was voided in part on Tenth Amendment grounds, the underlying statute was found to be constitutionally valid under the congressional power to impose a tax. No such alternative exists in this case.

regulate fishing in state waters (*Id.*) as it does so exclusively for tuna, shark, swordfish, and billfish.[16]

Lastly in this context, the court also makes a fundamental error in citing 16 U.S.C. § 5104(b)(1) for the proposition that the states "retain ultimate responsibility for promulgating and enforcing regulations within their waters." *Cape Cod Charter Boat Ass'n v. Burgum, supra*, at 5. But the pertinent section of the law clearly states:

> (b)(1) state implementation and enforcement: Each State identified under subsection (a) with respect to a coastal fishery management plan shall implement and enforce the measures of such plan within the timeframe established in the plan.

In fact, this does the opposite of what the court suggests because a coastal fishery management plan is the mandatory FMP prepared and adopted by the ASMFC: The term "coastal fishery management plan" means a plan for managing a coastal fishery resource, or an amendment to such plan, prepared and adopted by the Commission. (16 U.S.C. 5102(1)).

Simply stated, the essence of this case is that the 1984 and 1993 delegation of regulatory authority pursuant to fishery conservation and other federal mandates is not allowed by the Tenth Amendment to the U.S. Constitution, but it has continued unabated and aggrandized with scant judicial oversight over the last 40 years. On

_____

[16] https://www.fisheries.noaa.gov/topic/atlantic-highly-migratory-species; see also oral argument at ECF No. 101, p. 79.

information and belief, this a case of first impression not just in terms of pursuing

seeking actual constitutional analysis but also from the standpoint of aggregating all

the participating parties in one case as is appropriate in order to avoid the "divide

and conquer" approach that has allowed the ASMFC to essentially exist essentially

undisturbed notwithstanding the prior positions of the State of North Carolina that

the ASMFC is structured as an unprecedented inter-governmental apparatus of

dubious legality.

Likewise in the category of contradictory submissions in this case was the

Combined States (to include Connecticut) and DC Mem. which fails to mention of

*Connecticut ex rel. Blumenthal v. U.S.,* 369 F.Supp.2d 237 (D. Conn. 2005), where

that state's Attorney General, Richard Blumenthal, challenged the same federal law

as here on exactly the same Tenth Amendment (and Fifth Amendment) grounds

being advocated by the Plaintiffs in this case. That case was decided on other issues,

meriting attention in this context is this commentary from that court decision.

> Connecticut's original complaint challenged the constitutionality of the
> MSA as a whole, **and such an attack might have considerable merit**.
> The language of § 1852(a)(1)(A) is a command, not an invitation. *Id.* at
> 248. (Emphasis added).

## III. Standing is Inherent to a Claim of Unconstitutionally Induced Harm

The dismissal of Appellants' claims on standing rest on numerous erroneous

foundations and it slides too easily into a stark exemption from the landmark

decision in by Chief Justice Marshal that "every right, when withheld, must have a

remedy." 5 U.S. 137 (1803).[17]  That legal maxim has several pertinences in this case with first one being the comment in the Opinion that "Maryland *could* sue the Commission to prevent enforcement of the Addendum: but had elected not to do so." *Cape Cod Charter Boat Ass'n v. Burgum, supra*, at 20.

Appellants respectfully suggest that nowhere in the 232 years subsequent to *Marbury* is there precedent that claimants should have to rely on their state's Attorney General in order to obtain constitutional relief.  Carried to its logical conclusion, the effect of that argument would be that the constitutional rights of anyone in the United States could be sidestepped by simply by means of deputation via an Interstate Compact.[18]  What would that interpretation mean, for example, in the context of *Brown v. Board of Education,* 347 U.S. 483 (1954).[19]

---

[17] Chemerinsky, Erwin (2019). Constitutional Law: Principles and Policies, characterizing *Marbury v. Madison* as the single most important decision in American constitutional law.

[18] *See also*: "As federal law, congressionally approved compacts can preempt inconsistent state law, and no court may order relief inconsistent with a compact's terms **unless the terms violate the Constitution**." https://www.congress.gov/crs_external_products/LSB/PDF/LSB10807/LSB10807.5.pdf (Emphasis added).

[19] *See also Bell v. Hood*, 327 U.S. 678, 684 (1946) holding that "[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution and to restrain individual state officers from doing what the 14th Amendment forbids the State to do."

Next of significance is the court's concession that the Appellant MCBA has demonstrated sufficient injury, citing the declaration of its president and member, Captain Brian Hardman, had incurred a "75% decline in bookings during the 2024 season" and that "sign-ups for the 2025 season continue to be minimal compared to the same time period in 2023 and will likely decline even further." *Cape Cod Charter Boat Ass'n v. Burgum, supra*, Memorandum Opinion, p. 13. On this basis, the court properly concluded "At-the-motion to dismiss stage, that is enough." (*Id*.)

But then, the court below interposes the absence of redressability on the grounds that "Because Maryland enacts the restrictions through its **own** regulatory process, the laws would persist without Addendum II." *Cape Cod Charter Boat Ass'n v. Burgum, supra*, Memorandum Opinion, p. 15 (Emphasis added). But how is that possible when the Opinion elsewhere concedes Maryland's fishing regulations are not their <u>own</u> because they must comport the ASMFC <u>floor</u>?

The essential point in this context is that it was the one-fish-per-day limit which wreaked havoc upon the Maryland Boat Captains' income. That was always the most critical and truly destructive component of Addendum II and the reason for certain that Maryland voted against Addendum II when it first appeared on the ASMFC agenda.

Further with respect to the ASMFC's striped bass one-fish-per-day limit on Maryland charter boat customers, Mr. Michael Luisi, the Assistant Director of

Fisheries Management, specifically warned his counterparts at the Commission that limiting the catch of Maryland's charter boat customers to one fish a day "will put people out of business."   https://www.bayjournal.com/news/fisheries/striped-bass-harvest-restrictions-trigger-widespread-impact/article_e5e19f68-d4c5-11ee-8f54-c37c5983df6c.html

But his warnings were ignored as were the Boat Captains and rural county commissioners and (last one below) a waitress at one of the local Chesapeake Bay restaurants:

Throughout this process,

- "Taking away our ability to catch two fish per person is a clear sign you are trying to completely shut down our businesses and deny us the right to make a living."

- "We cannot survive with the new regulations."

- "No one is going to pay that kind of money to catch ONE FISH." (Compl. Ex. C) (Emphasis in the Original).

In light of this history, the court's  recitation that Maryland would, on its own initiative, have adopted the one-fish-per-day regulation that its ASMFC delegates spoke against, then voted against, and then afterwards cast doubt about the science underlying all of Addendum II, makes no sense.  And yet, the court below rests its entire ruling on speculation of this sort which, as already noted,  Chief Justice Roberts has said is outside the scope of what litigants are required to rebut:

31

We have held that a litigant challenging governmental action as void on the basis of the separation of powers is not required to prove that the Government's course of conduct would have been different in a "counterfactual world" in which the Government had acted with constitutional authority. *Seila*, *supra* , at 212.

That being the case, the Appellants' Article III standing element is straightforward  combination of *Axon, et al.* to the effect that being subjected "to "unconstitutional agency authority" is a "a here-and-now injury," and any number of  the recently prominent constitutionally-oriented fishing cases including nothing less than the most prominent case in the last term (*Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024)) standing for the proposition that governmental actions under the MSA adding to the cost of conducting a fishing businesses (or, in this instance subtracting from fishing income) suffices for Article III standing.

 The Third Circuit could not have stated this Supreme Court precedent more clearly than in *Lofstad v. Raimondo,* 117 F.4th 493, 501 (2024):

> The fishermen have standing. First, a "litigant need not show direct harm or prejudice caused by an Appointments Clause violation …. **Such harm is presumed**." … What is more, the fishermen show evidence of two injuries: **For one, they have enough evidence at this stage for " 'a here-and-now-injury' "** because they claim that they were subject to "an agency … wielding authority unconstitutionally.
>
> For another, they allege that the amendment cost them money… **By lowering those limits, the amendment reduces how many fish they may catch and how much money they make**. So the fishermen have shown enough of an injury…

Third, we could remedy those injuries by undoing the amendment and implementing regulations. **That is enough for standing**. (Internal citations omitted.) (Emphases added).

*Lofstad* is also remarkably similar, if not identical in principle, to the instant case in that the federal government, as the Defendant in *Lofstad*, argued that the requirement for a subsequent third-party (the U.S. Secretary of Commerce) to act before the fishing regulation became effective industry broke the casual chain connecting the challenged rule from the Plaintiffs' harm. The Federal Appellees, in their Memorandum in Opposition seek the same escape route behind the fact there is still a predicate step necessary in the form of the ASMFC participating states adopting conforming regulations (ECF No. 42, p.13). But this effort must likewise fail here as well in the face of Supreme Court decision in *Bennett v. Spear,* 520 U.S. 154, where the Court dismissed exactly that defense in stating that "This wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. at 168-69).[20]

---

[20] *See* also in this Circuit: "Article III standing does not follow the causation principles of tort law; an injury may be "fairly traceable" to an agency action that is not "the very last step in the chain of causation," *Maine Lobstermen's Assn v. Nat'l Marine Fisheries Service* citing, 70 F.4th 582 (D.C. Cir. 2023).

*Lofstad* is also instructive in that the dissenting judge in that decision, while splitting from the majority as to the appropriate remedy, did not differ as to standing with regard to either causation or redressability: "the power to actually promulgate regulations is where the rubber meets the road." *Lofstad v. Raimondo* 117 F.4th at 502.[21] The relevance of that statement here, of course, is that it is the ASMFC which possessed "promulgation" authority with respect to Addendum II albeit that authority having been delegated to the ASMFC in violation of the Tenth Amendment.

The Opinion below completely ignores this Circuit's unanimous recent decision in *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Service,* No. 22-5238 (2023) terming the fishermen's similar standing as here to be "self-evident":

> The lobstermen's standing to challenge the phase one rule is **self-evident, as they are the "object of the action**." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). According to the Service,[22] (i) the phase one rule will cost lobstermen $50 to $90 million over the first six years. This concrete, particularized pocketbook injury gives the lobstermen a stake in the outcome of the suit. (ii) The harm is caused by the defendant Service, which promulgated the rule, and (iii) it may be redressed by the court; should the lobstermen prevail, we may vacate or remand the rule, giving them relief from enforcement, or at least

---

[21] Notable as well is the fact that the Department of Justice declined to contest the Circuit decision in *Lofstad* (Letter by Acting Solicitor General, Sarah M. Harris, dated Feb. 5, 2025).

[22] "Service" therein refers to the National Marine Fisheries Service ("NMFS") which is a part of NOAA.

a chance on remand to pursue their case against the rule free of the Service's alleged legal errors.[23] (Emphasis added).

Along the same line is the Fifth Circuit's recent fishing decision in a fishing case overturning a NOAA/NMFS regulation requiring certain charter boats to install GPS-tracking devices. There, the court simply pointed to "significant fees for charter-boat owners, for they primarily operate small businesses, with roughly $26,000 per year in net income" and deemed it unnecessary to include any "standing" discussion. It did, however, make this other very telling point, which is 100 percent applicable to the instant case:

> [T]his makes the same mistake as before: it considers the risk of the general fishing industry, **instead of considering the risk of the charter-boat fishing industry**. And the only evidence presented here shows that charter-boat fishing does not pose an overfishing risk because it accounts for a small percentage of total fishing within the Gulf of Mexico. *Mexican Gulf Fishing v. Department of Commerce,* No. 22-30105 (5th Cir. 2023) (Emphasis added).

In yet another relevant fishing case finding the MSA structure unconstitutional, *New England Fishermen's Stewardship Ass'n v. Raimondo,* No. 2:23-cv-00339 (D. Me. 2024), the standing issue was addressed at length with the District Court first noting the Supreme Court's guidance that where "the plaintiff is himself an object of the action … there is ordinarily little question that the action or

_____

[23] Also cited in the Appellants' Injunctive Motion and referenced by Appellants' counsel during oral argument (19-20).

inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defenders of Wildlife Fed'n*, 504 U.S. 505, 561-62 (1992). Thus, the Maine Court properly found that Plaintiffs' claim for relief could <u>not</u> properly be denied based on procedural deficiencies with regard to either causation or redressability when the claim relates to unconstitutional structure.[24]

That the Appellees (and the court below) would insist that the ASMFC does not regulate fishing and equally that the State of Maryland would have acted independently to adopt the one-fish-per-day limit that it warned against, argued against, and voted against only makes sense from the standpoint that without these fictions, their argument against standing would collapse.

In summary, the preponderance of cases in this Circuit and beyond stand for the proposition that unconstitutionality as regards the underlying statute, plus actual harm to the litigants, plus the ability to redress by enjoining and vacating Addendum II (or more) postulates standing against all the named Appellants.

---

[24] *See also* in this Circuit, *Defenders of Wildlife Fed'n v. Gutierrez*, 532 F.3d 913, 924 (D.C. Cir. 2008) explaining that, for purposes of standing, a court must presume that petitioners will prevail on the merits and *Natural Resources Defense Council, Inc. v. Raimondo*, *supra,* that vacatur of the regulation equates to standing to bring an action.

**IV.    The Eleventh Amendment Is No Bar to this Action**

The Combined States & District of Columbia claim that they "are immune from the Plaintiffs in this court pursuant to the Eleventh Amendment's generalized ban on a state being sued in federal court without consent suit and the court below adopted that position. *Cape Cod Charter Boat Ass'n v. Burgum, supra*, Memorandum Opinion, p. 21.  But *Cuyler v. Adams,* 449 U.S. 433, 438 (1981) points out that no such exemption pertains to cases and controversies arising under federal law:

> Because congressional consent transforms an interstate compact within this Clause into a law of the United States, we have held that the construction of an interstate agreement sanctioned by Congress under the Compact Clause presents a federal question.

The non-federal and the State Defendants cite no case for the proposition that an Interstate Compact or that individual States participating in an interstate compact are entitled to Eleventh Amendment protection.  In fact, their legal status is quite the opposite in as would logically follow from the premise that joining a binding Interstate Compact is, by definition, a waiver of state sovereign immunity as per these excerpts from a recent Third Circuit case involving an interstate compact between Pennsylvania and New Jersey:

> The Secretary first claims the District Court lacked jurisdiction because the Commission's complaint was barred by the Eleventh Amendment to the United States Constitution…

As a general rule, "federal courts may not entertain a private person's suit against a State' unless the State has waived its immunity (cites omitted) Under a federal court's equitable powers, however, there is an important exception to this general rule: in certain circumstances, a plaintiff may bring a federal suit against state officials. See *Ex parte Young*, 209 U.S. 123 (1908). In such cases, state officials are stripped of their official or representative character and thereby deprived of the State's immunity when they commit an ongoing violation of federal law…

The Secretary argues *Ex parte Young* does not apply because the Commonwealth of Pennsylvania, not the Secretary, is the real party in interest. We disagree. *Delaware River Joint Toll Bridge Comm'n v. Secretary Pennsylvania Department of Labor and Industry*, No. 20-1898 (2021).

Such an argument , we held, "misapprehends the notion of sovereignty surrender discussed by the Supreme Court in *Hess*[25] and this Court in *Operating Engineers*[26]… the creation of a bi-state entity pursuant to the Compact Clause is an unambiguous surrender.

One further note with respect to the judicial history of this bridge centers on

a separate case, *Delaware River Joint Toll Bridge Commission v. Oleksiak,* 612 F.

---

[25] *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30 (1994); *see also Galette v. New Jersey Transit Corporation* (S. Ct. No. 24–1021, Mar. 4, 2026) holding unanimously that NJ Transit—a public corporation created by the New Jersey Legislature to operate bus and rail transit—does not qualify as an "arm of the state" and therefore cannot invoke New Jersey's sovereign immunity in court. Similarly, the ASMFC's 1942 congressional ratification characterizes the entity as a "body corporate." (Art. III).

[26] *International Union of Operating Eng'rs, Local 542* v. *Delaware River Joint Toll Bridge Comm'n*, 311 F.3d 272 (3d Cir. 2002).

Supp. 3d 428 (E.D. Pa. 2020), where it was noted after the two states had agreed to the compact and its subsequent ratification by the Congress, there were several amendments thereafter occurring without the consent of Congress. In that situation, the Third Circuit said this during its review: "**We may only consider the terms of the Compact approved by Congress**." *Id*. at 435 (Emphasis added).

As already noted, there has <u>never</u> been a congressional ratification of the ASMFC Interstate Compact post-1950 to include the 1984 grant and the 1993 expansion of its mandatory powers; nor, as argued here, would such action be constitutional were it to have been conferred.

Moreover, on information and belief following reasonable inquiry, there has likewise never occurred any authorizing state legislation or other official state ratification regarding the 1984-1993 Acts of Congress on the part of the 15 compacting states outside the initial 1942 ratification and that pertaining to the 1950 ASMFC charter amendment eliminating the 15-year initial term of the first Ratification. Appellants have raised this lack of subsequent state concurrence in their prior and in the Reply Brief as to this case (ECF No. 52, p. 11) to which the Appellees have never took exception nor submitted countermanding documentation.

The relevance of this herein is that under well-established Supreme Court precedents, an Interstate Compact, when approved by Congress, not only becomes federal law but are to be "are construed as contracts under the principles of contract

law." *Texas v. New Mexico,* 482 U.S. 124 (1987): "[a] Compact is, after all, a contract." S*ee also, Tarrant Regional Water Dist. v. Herrmann*, 569 U. S. 614, 628 (2013): "Interstate compacts are construed as contracts under the principles of contract law."

As to this case, the jurisprudential treatment of an Interstate Compact as a contract gives rise to a significant flaw given that there were no post-1950 congressional ratifications involved and, even more importantly no indications of state affirmation of concurrence when the ASMFC was converted from an advisory body into the federal government's regulatory "partner" with significant mandatory powers of its own.

Privity of Contract is an elementary doctrine of contract law holding that contracts cannot be altered to provide rights or obligations to entities other than by joint agreement of those who are parties to the contract. Restatement (Second) of Contracts. Stated simply, A can contract with B and B is free to enter a contract with C, but the latter can in no manner alter the contract between A and B. As applied here, the Congress and the ASMFC can promote and participate, as they have, to any form of congressional arrangement, but since there has been no post-1950 congressional ratification sanctioning a new agreement with any states, nor any overt official state actions agreeing to either the 1984 or 1993 Acts of Congress, there can be no sanctioned interstate compact contractual relationship between the

Congress and any state regarding the 1984-1993 federal statutes. This conundrum is almost certainly what led the North Carolina Office of Attorney General to insert this additional observation into its aforementioned 1996 Advisory Opinion:

> The enlarged powers and duties granted to the ASMFC … effectively amended the Compact by converting an advisory body with regulatory powers by consent into a regulatory body which required no consent to regulate the states. **Our research discloses no case which determined the law concerning the power of the Congress to unilaterally amend a compact.** (At p. 4) (Emphasis added.)

## V.     No Rational or Scientific Basis for the Regulation

In addition to the continuing harm and in many instances the permanent closure of Appellants' businesses, it bears mention that all of this is being done in the complete absence of anyone, including the ASMFC or any of its participating states claiming that Atlantic Striped Bass are a protected species or even being overfished.[27]   In fact, the exact opposite has been the case over the last five years across the entire east coast as well described in a recent article by Capt. John McMurray, a prominent and well published outdoor writer, notable for his work on fisheries conservation issues and a former appointee to the ASMFC:

- **Striped bass aren't "endangered"… No reputable scientist, advocate or fisherman has said or is saying they are.**

---

[27] ASMFC Review of the Interstate FMP for Atlantic Stripped Bass (Jan. 2024, p.2). https://www.asmfc.org/species/atlantic-striped-bass

- Last fall, all the way into December, was arguably the best we've ever seen on the South Shore of Long Island. I know I said that about last year, and probably the year before too. But really, it's just gotten better. **I'm talking feeding-frenzies.**

- Projections show that the spawning stock biomass will reach the 1995 rebuilt level in 2025. In other words, we're really close to the same spawning stock biomass when striped bass was previously declared rebuilt. But…the "spawning stock biomass" target is 25% higher than it was back then, and the management plan requires that we go the full distance by 2029. **So here we are, under the gun, to get it to a historically high level by 2029, one that we've only seen four times in the 40-year time series**.[28]

At the current time, there is an estimated 240 million Striped Bass in U.S. coastal and inland waters.[29] Out of this magnitude, the ASMFC and other Defendants purport to be able to count that current level of fish by one-year size (less than two inches), add in the aggregate fishing mortality levels and then project through "modeling" an estimate out five years to the adult population in 2029. This is a preposterous claim on its face with the published results, as indicated below, proving the same with variances ranging from 97 to 15 percent over just a three-year period.

_____

[28] https://conservefish.org/2025/01/30/whatsreally-going-on-with-striped-bass/ "What's Really Going On with Striped Bass" (Emphases added).

[29] https://archive.asmfc.org/uploads/file/646d15d5AtlStripedBassAssessmentUpdate_Nov2022_SuppMay2023.pdf, p. 14.

ASMFC Projection of Achieving 2029 Targeted
Striped Bass Female Spawning Stock Biomass (SSB)[30]

| SSB | Stock Assessment Year | SSB Projection |
|------|------------------------|----------------|
| 2023 | 2022 | 97% |
| 2024 | Updated 2022 | 15% |
| 2025 | March, 2025 | 49% |
| 2025 | Summer, 2025 | 30% |

How can any of this data be believed especially when accompanied by disclosures such as these contained in the ASMFC's own documents prepared by its Technical Committee:[31]

- Stock projections represent the TC's best **assumptions** about what may happen under status quo management.

- TC notes predicting future fishing mortality, effort, and recruitment is **highly uncertain.**

- Use the most recent 6 years of **very low recruitment** instead of the 2008-2023 values.

- TC notes these sensitivity runs are **more pessimistic** scenarios compared to the base run; **do not encompass possibility of more optimistic scenarios (Emphases added.)**

But in the meantime, no one is disputing the fact that Appellants' businesses are being destroyed or substantially impaired while the court below goes through

_____

[30] https://asmfc.org/wp-content/uploads/2025/01/AtlStripedBass_AddendumII_Am7_Jan2024-1.pdf, p. 3.

[31] *Id*.

legal contortions to deny a day in court to what, even in the best of years seasonal and marginal family businesses seeking to make it through the next generation.

This Circuit has specifically admonished against precisely this type of governmental behavior with respect to the fishing industry in the unanimous ruling opinion by Judge Ginsberg in *Maine Lobstermen's Ass'ns, supra:*

> Statutory text and structure do not authorize the Service to 'generally select the value that would lead to conclusions of higher, rather than lower, risk to endangered or threatened species' whenever it faces a plausible range of values or competing analytical approaches. The statute is focused upon 'likely' outcomes, not worst-case scenarios. It requires the Service to use the best available scientific data, not the most pessimistic.

> The presumption in favor of the species… prevents the agency from "paying attention to the advantages and the disadvantages" of the action, and invites the unnecessary economic dislocation wrought by worst-case thinking. *Michigan v. EPA*, 576 U.S. 743, 753 (2015). A presumption also ignores that worst-case scenarios lie on all sides … permanent fishery closures may be the only solution. The result may be great physical and human capital destroyed, and thousands of jobs lost, with all the degradation that attends such dislocations. (At 599- ___)

As noted, after the emergence of its defective and biased methodology, the ASMFC designee from Maryland stated publicly in a March 9, 2025 newspaper article that the "science may be imperfect" regarding the entire 2024 Striped Bass Rule (Compl. ¶ 47). This was despite the fact that the ASMFC had previously claimed that: "The stock assessment model for striped bass, including the methods used for projections, has been extensively peer-reviewed by external experts and ...

was scientifically sound and appropriate for management use, making it **the best available scientific method for striped bass**." *Id.,* ¶ 48 (Emphasis added).

The collapse of the purported science behind the ASMFC and related governmental organizations has been so dramatic that the New England Fishery Management Council, which itself is a federal entity established under the MSA, went so far as to say in an extensive report released by letter dated Dec. 10, 2024, that there has been a "fundamental breakdown in the scientific support system for fisheries management."[32] Of particular relevance here, that research study faults the underlying science on the same grounds as this case (and its prior iteration), namely that in "recent years, there have been substantial up and down swings of catch advice for several stocks resulting from changes in assessment methods or application of data sources. Catch advice differences on the order of 50-90% in either direction have been common." (*Id.,* Attachment thereto).

Annual disparities to this extent leave little room for doubt that the federal and state governmental data long in use by the ASMFC and as provided and verified by its "primary research agency" (the USFWS) are arbitrary and capricious. As applied

_____

[32] https://d23h0vhsm26o6d.cloudfront.net/241217-NEFMC-to-NEFSC-Scientific-Support-Issues.pdf; see also https://www.seafoodsource.com/news/environment-sustainability/nefmc-letter-claims-fundamental-breakdown-in-scientific-support-for-key-fisheries-management-decisions.

to this case, the usage of such clearly defective methodology fails to meet the most minimum due process requirements in order to serve as a reasoned basis for the uncontested and ongoing destruction/attenuation of Appellants' businesses M*otor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins.,* 463 U.S. 29 (1983))

Lastly on this point and with reference to the Fifth Circuit notation in *Mexican Gulf Fishing, supra,* as to keeping the focus on the fact that charter boats account "for a small percentage of total fishing," here is the data bearing on the one-fish-per-day limitation as per the Chesapeake Bay where Addendum II impacts most heavily.

Charter Boat "for hire" Removals % Change from 2021[33]

| Year | Charter Boat "for hire" Removals | % Change from 2021 |
|---|---|---|
| 2021 | 121,771 | |
| 2022 | 116,581 | -.9% |
| 2023 | 101,043 | -17% |
| 2024 | 34,985 | -73% |
| 2025 (through Sept.) | 27,000 | -79% |

According to the ASMFC's own data, out of the universe of the approximately 240 million Atlantic Strip Bass, there are an estimated six million in annual striped

---

[33] Data derived from Fishing Activity & Catch Tracking System (FACTS™) which is an online harvest reporting system developed and administered by the Maryland Dept. of Natural Resources for use by all Maryland commercial watermen.

bass fishing removals. [34]   In contrast to that number the pre-Addendum II Chesapeake Bay charter boat removals were 101,043 (i.e., 0.17%).  While obviously critical to the individual charter boat captains, extracting 101,000 fish out of the six million fishing removals over a universe of 240 million (i.e., 0.0004).[35]  Thus the end result, as was forewarned, is a statistically  meaningless number to the fish population as a whole while at the same time devastating to the charter boat captains and the  rural communities where the preponderance of their business is conducted.

## VI.    The Fifth Amendment Takings Clause Is Fully Applicable

While the decision below precluded consideration of the Appellant association members' rights under the Fifth Amendment to the U.S. Constitution providing that: "No person shall … be deprived of life, liberty, or property, without due process of law;" some discussion of that claim is warranted here as Appellants also injunctive relief below.

The ASMFC Opposition Brief states that "Addendum II does not deprive anyone of vessels, gear or any other property" or any "physical appropriation" of property…"  (ECF No. 48, p. 39).  That, however, is a very limited not to mention

_____

34

https://archive.asmfc.org/uploads/file/646d15d5AtlStripedBassAssessmentUpdate_Nov2022_SuppMay2023.pdf, p. 9.

[35] That percentage is actually overstated by 50 percent since the fishing removals do not distinguish as between the male from female species at point of catching.

incorrect recitation as to the scope of the Fifth Amendment as Chief Justice Roberts made clear in *Horne v. Dep't of Agriculture,* 576 U.S. 351 (2015).

The *Horne* case also contains very pertinent language for present purposes via its cross reference to the establishment and explanation of what has come to be known as a "Regulatory Taking" via the "economic impact of the regulation:"

> Prior to this Court's decision in *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393 (1922), the Takings Clause was understood to provide protection only against a direct appropriation of property—personal or real. *Pennsylvania Coal* expanded the protection of the Takings Clause, holding that compensation was also required for a *"***regulatory taking***"* — a restriction on the use of property that went "too far." *Id.*, at 415. And in *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104, 124 (1978), the Court clarified that the test for how far was "too far" required an "ad hoc" factual inquiry. That inquiry required considering factors such as **the economic impact of the regulation***…* *Id.,* at 360 (Emphases added).

This case presents precisely that situation described above in that, by virtue of the ASMFC action, the vessels and other personal business property of the Plaintiffs have been taken, in the Supreme Court's own words, via "the economic impact of the regulation." It bears reiteration in this context that the ASMFC action in promulgating Addendum II did not simply inflict limited, nor even what could fairly be described as substantial harm to Appellants' business properties. As had been indicated throughout the entire process, it caused the full destruction of the economic value of the Appellants' property utilized in the "for hire" striped bass industry.

In addition to their vessels and other personal property used for business

businesses, Appellants in many instances have real property interests at stake in the

form of marina storage and maintenance facilities for their charter boats. Whether

the property be realty, personalty or some other form of business asset, the

underlying constitutional protection is the same as expressed by Justice Scalia in

*Lucas v. South Carolina Coastal Council*:

> [T]he notion … that title is somehow held subject to the 'implied limitation' that the State may subsequently **eliminate all economically valuable use** is inconsistent with the historical compact recorded in the Takings Clause that has become part of our constitutional culture. 505 U.S. 1003, 1028 (1992) (Emphasis added).[36]

Addendum II has also been effectuated in opposition to another very pertinent

of the Fifth Amendment's constitutional protections. As stated in *Armstrong v.*

*United States*: "The Fifth Amendment's [Takings Clause] … was designed to bar

Government from forcing some people alone to bear public burdens which, in all

fairness and justice, should be borne by the public as a whole." 364 U.S. 40, 49

(1960).

_____

[36] *See also, Lebanon Valley Auto Racing v. Cuomo*: "Fluctuations in profitability under a new regulation do not establish a regulatory taking, **provided that the state's action does not destroy the marketability of the regulated property**." 478 F. Supp.3d 389, 401–02 (N.D.N.Y. 2020) (Emphasis added).

Under Addendum II, there can be no question that the adverse impact has fallen almost exclusively upon the Appellant charter boat captains in terms of its destructive and permanent impact. The Supreme Court decision in *Armstrong* also specifically rejected the aforementioned ASMFC assertion that "the **alleged** economic harms are **incidental** effects of the sort that could be alleged for almost any regulation." (ECF No. 48, p. 42).

With no comment on the use of the words "alleged" and "incidental" in the content of 60 charter boat businesses already having been shut down by operation of Addendum II, this aspect was specifically addressed by the Supreme Court in *Armstrong* where the claimants' property consisted, by coincidence, of liens on a boat:

> The total destruction by the Government of all value of these liens, which constitute compensable property, has every possible element of a Fifth Amendment "taking," and is **not a mere "consequential incidence"** of a valid regulatory measure. Before the liens were destroyed, the lienholders admittedly had compensable property. Immediately afterwards, they had none. This was not because their property vanished into thin air. It was because the Government, for its own advantage, destroyed the value of the liens. *Armstrong*, *supra* at 48.

As a final matter with respect to the established jurisprudence regarding the Fifth Amendment takings, there is also the "character" of the governmental action

which comes into play.[37]  This criterion focuses not just on the particularized impact of the government action (as above) but whether or not it was targeted at specific persons.  When that is the case, then it is deemed additional support for the finding of a "taking."  *Am. Pelagic Fishing Co. v. United States,* 49 Fed. Cl. 36, 51 (2001); rev'd on other grounds, 379 F.3d 1363 (Fed. Cir. 2004).

The unambiguous answer to the "targeting" question in this instance is again provided in ASMFC's own words in the form of the Declaration of Ms. Toni M. Kerns, the ASMFC's Fishery Policy Director, as attached to the Appellee's Memorandum in Opposition to the Motion for Preliminary Injunction:

> Although fishing mortality is not the only source of mortality for striped bass – water quality issue, increasing invasive predator populations, disease, and climate change may also have an impact on the population – it is an extremely important factor, and **it is the only source of mortality that the ASMFC has the practical ability and legal authority to constrain.  (**ECF No. 48-1, p. 20) (Emphasis added).

This is an astounding statement for several reasons.  The first is that it lists four <u>non-fishing</u> contributors to Striped Bass habitat including "invasive predator population."  Omitted from that sentence is the name of that invasive predator which

_____

[37] *See* Steven J. Eagle, The Four-Factor Penn Central Regulatory Takings Test, 118 Dick. L. Rev. 601, 616 & fn.92 (2014).

is the Blue Catfish introduced as a sport fishing inducement in 1974 into Virginia's James, Rappahannock and York rivers while all these Chesapeake Bay tributaries were under the supervision and control of the ASMFC.

According to Dr. David Secor, Professor of Fisheries Science at the University of Maryland:

> Blue catfish, an invasive species, prey on young striped bass and are now the Bay's dominant fish-eating predator … There are millions of blue catfish in each major tributary now, and **they're highly concentrated in the same nursery habitats that striped bass depend on.** Chesapeake Bay Foundation: Secrets of the Striper (Mar. 6, 2024 Blog Post) (Emphasis added).

The second is that there are two major omissions from the ASMFC list of four major non-fishing pollutants to the Chesapeake Striped Bass habitat. These are the Conowingo Dam situated in the lower Susquehanna River just south of the Pennsylvania border which on average, traps about three million pounds of phosphorus and four billion pounds of sediment annually that is notorious during storms and even heavy rains for dumping tons of that pollution overflows into the Susquehanna River which is the main feeder into Chesapeake Bay. (National Wildlife Federation Blog: *A Big Dam Problem: Cleaning up Conowingo* (May 30, 2023)).

According to another environmental group, the Chesapeake Bay Program, agricultural runoffs are another significant contributor to water quality in the Bay,

contributing 48 percent of the nitrogen load, 27 percent of the phosphorus load, and nine percent of the sediment load. (Chesapeake Bay Program: *Learn the Issues: Agriculture Runoff*).

Yet, none of these six factors found their way into the purported ASMFC "scientific" basis underlying Addendum II. Instead, ASMFC chose to target the net 50,000 Striped Bass mortalities that were essential to the conduct of Appellants' businesses even though they amounted to less than one-tenth of one percent of annual Striped Bass fishing removals. Why? In ASMFC's own words, because they were "the only source of mortality that the ASMFC has the practical ability and legal authority to constrain."

Third, the words just cited are one hundred percent in contradiction of the Commission's plethora of statements in submissions below that the ASMFC does not engage regulating the fishing industry. How does Ms. Kern's statement that "that the ASMFC has the practical ability and legal authority to constrain" the operation of charter boats not equate to the regulation of fishing?

## CONCLUSION

The preponderance of cases in this Circuit and beyond stand clearly for the proposition that credible allegations as to the unconstitutionality of the underlying statute plus actual harm to claimants the (Appellants here) plus the ability to redress by enjoining or vacating some or all of the offending language:

Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Free Enterprise Fund*, 561 U. S. 477, 508 (2010) (internal quotation marks omitted).

This is a commonplace judicial remedy, but the court below has bypassed this responsibility by the following actions, among others:

(1) Denial of the obvious, e.g., the ASMFC does not regulate the fishing industry even though it sets a "floor" under a state's minimum fishing limits;

(2)  Suggesting that a "federalism-based" violation not the "sort of constitutional defect" that qualifies for Article III review;

(3) Departure from established Supreme Court precedents, e.g., traceable causation is not terminated by subsequent third-party action (*Bennett*, *supra*);

(4) Reliance on counterfactual events, e.g. Maryland adopting the one-fish-per-day limitation on its own (*Seila Law, supra*);

(5) Dismissing the waiver of Eleventh Amendment immunity attendant to state official exercising Interstate Compact authority (*Ex parte Young*); and, most significantly,

(6) Deprived the Appellants of their constitutional rights under circumstances that the Supreme has recognized repeatedly (*e.g., Loper, supra*) and this Circuit has deemed "self-evident (*Maine Lobstermen's Ass'n, supra).*

For the reasons stated herein, Appellants urge this honorable Court to vacate the District Court's judgment dismissing their case and remand the case back to the District Court for discovery and evidentiary proceedings whereby Appellants can be properly accorded due process of law and thereby offer proof of their claims and defend against the pseudo-science underlying Addendum II.

## REQUEST FOR ORAL ARGUMENT

Appellants respectfully request that this Court allow for oral argument in this case.

## DESIGNATION OF THE PARTS OF THE RECORD
## REQUESTED TO BE INCLUDED IN THE DEFERRED APPENDIX

Pursuant to Circuit Rule 30(c)(1), Appellants hereby designate the parts of the record below they want included in the Deferred Appendix, namely their Complaint (ECF No. 1) and the District Court's Memorandum Opinion (ECF No. 85).

## CERTIFICATE OF COMPLIANCE

This Opening Brief of Appellant has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point. Exclusive of the table of contents; table of citations; certificate of compliance and the certificate of service, this Opening Brief of Appellant contains 12,856 words. I understand that a material misrepresentation can result in the court's striking the brief and imposing sanctions.

Respectfully submitted this 27th day of April 2026.

/s/ James J. Butera
MEEKS, BUTERA & ISRAEL
2020 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 285-3382
jbutera@meeksbi.com

/s/ Andrew C. Meehan
MACLEOD LAW GROUP
110 North Cross Street
Chestertown, MD 21620
Tel: (410) 810-1381
ameehan@mlg-lawyers.com

# CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of April 2026 the foregoing has been e-filed via the Court's CM/ECF system, which sends a notification of such filing to all attorneys of record. Additionally, hard copies have been sent by ordinary mail to the following defendants who have not had an attorney enter an appearance on their behalf:

Cheri Patterson in her official capacity as Administrator of
New Hampshire Fish and Game Dept. - Marine Fisheries
11 Hazen Drive
Concord, NH 03301

New Hampshire Fish and Game Dept. - Marine Fisheries
11 Hazen Drive
Concord, NH 03301

John Clark in his official capacity as Administrator of the
Delaware Division of Fish and Wildlife
89 Kings Highway
Dover, DE 19901

/s/ Andrew C. Meehan
Andrew C. Meehan